**In the Matter of Jerry Wolman and Anne Wolman, Debtors.**

**Jerry WOLMAN and Anne Wolman, Appellants,**

v.

**Leonard H. TOSE, Appellee.**

**No. 72-1215.**

United States Court of Appeals, Fourth Circuit.

Argued May 31, 1972.

Decided Sept. 7, 1972.

---

Gary A. Goldstein and Charles M. Tatelbaum, Baltimore, Md. (Hyman P. Tatelbaum, and Schimmel & Tatelbaum, P. A., Baltimore, Md., and Robert B. Hirsch, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., on brief), for appellants.

Howard H. Conaway, Baltimore, Md. (George W. Liebmann, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., and Raymond Pearlstine, and Wisler, Pearlstine, Talone, Craig & Garrity, Norristown, Pa., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

This case involves a Chapter XI bankruptcy proceeding. Specifically, we are called upon to review the District Court's affirmance, 334 F.Supp. 1246, of the bankruptcy Referee's order dismissing an application by Jerry Wolman and Anne Wolman, the Debtors, seeking specific performance of an agreement between the Wolmans and Appellee Leonard Tose. Because we think the Wolmans' application presented factual issues not susceptible of resolution without an inquiry into the facts, we reverse and remand for further proceedings.

I

The facts of this case are a rat's nest typical of many Chapter XI proceedings.

Nevertheless, a summary is indispensable to an understanding of the legal issues. From the record and the opinions of the Referee and the District Court, the following history emerges:

This proceeding originated on December 13, 1967, with the filing of a petition under Chapter XI. At that time, the Wolmans owned 52% of the stock of the Philadelphia Eagles Football Club, Inc. [Eagles], which stock was subject to the claims of the Wolmans' secured creditors.

On April 22, 1968, the Wolmans proposed their first Plan of Arrangement. Briefly, this Plan contemplated the formation of a new company—Jerry Wolman Enterprises, Inc. [Enterprises][1] and, after approval by the S.E.C., public sale of Enterprises stock. Part of the proceeds of this public offering were to be loaned to the Wolmans, with their 52% interest in the Eagles pledged as security. The sums loaned were, in turn, to be used by the Wolmans to pay off their secured creditors. Pursuant to 11 U.S.C. § 762, this first Plan of Arrangement, with minor modifications, was approved by a majority of the unsecured creditors.

Before long, the Plan ran into trouble. Due in part to difficulties encountered in the S.E.C., the sale of Enterprises stock was delayed, thus prompting the secured creditors to apply for permission to sell the Eagles to satisfy the Wolmans' debts. To forestall this eventuality, the Wolmans entered into an agreement with Leonard Tose, whereby he would buy the Eagles from them. Payment for the club was to be accomplished by Tose satisfying the claims of the secured creditors—a sum of approximately $16 million.

After the Referee passed an order approving the sale by the Wolmans of the Eagles' assets to Tose, but before the actual sale, the Wolmans, on March 11, 1969, entered into another, related agreement with Tose, hereinafter referred to as the "March 11 Agreement." The latter agreement became the seed of this litigation. In pertinent part, the March 11 agreement provided:

If * * * the Wolmans are able to fund the Debtors Plan of Arrangement, they shall have until 4:00 P.M., August 1, 1969 to make Tose whole, and upon their doing so, the assets of the Philadelphia Eagles Football Club, Inc. shall revest in it.

S.E.C. approval of the public sale of Enterprises stock was eventually granted but, because the stock would not sell, the hoped for funds for the proposed loan by Enterprises to the Wolmans did not become available. This forced the Wolmans to abandon entirely the first Plan of Arrangement and substitute, on May 28, 1969, their second Plan of Arrangement.

The second Plan, approved by a majority of the unsecured creditors on June 18, 1969, eliminated all reference to Enterprises. Instead, the Plan provided for an immediate cash deposit of $500,000,[2] required under 11 U.S.C. § 737(2), to cover the costs of administration and priority debts allowed by the court. The Wolmans were then to execute a $3 million promissory note in favor of the unsecured creditors. The note was to be paid off in ten yearly installments of $300,000 each.[3]

---

1. The assets of Enterprises were to consist of the Wolmans' 100% interests in the following companies: (1) Spectrum Arena, Inc.; (2) Connie Mack Stadium Limited Partnership; and (3) The Yellow Cab Companies. The Wolmans' 52% interest in the Philadelphia Eagles Football Club, Inc., was not to be transferred to Enterprises because the National Football League forbids public ownership of its franchises.

2. This amount was later reduced, by order of the Referee, to $300,000.

3. The second Plan of Arrangement was confirmed by the Referee on May 19, 1970. As of the date of the District Court's opinion, the Wolmans had made the first of the ten $300,000 yearly installments contemplated by the Plan.

Prior to the initial $500,000 payment under the second Plan, the attorney for the Wolmans sent the following letter to Tose's attorney:

The Wolmans are ready to proceed with their plan of arrangement and in this connection to recover the assets of the [Eagles]. Will you please obtain a statement from Leonard Tose showing the amount necessary to make him whole, as contemplated by the writing of March [11], 1969. Will you ask Mr. Tose to make the statement detailed. We assume it will take only a few days to obtain this data, and that we will have it before a scheduled meeting on the 18th.

Tose's attorney rejected the Wolmans' request, asserting that the March 11 agreement was no longer operative or binding:

The agreement of March [11], 1969 explicitly required the funding of the debtors' plan of arrangement in existence as of that date. The plan of arrangement provided that the funding arise from the sale of an offering of securities by Jerry Wolman Enterprises, Inc.

The debtors' plan of arrangement as filed on May 28, 1969 proposes a new method of funding that does not meet the conditions of the March [11], 1969 agreement. I have therefore advised Mr. Tose that he is under no obligation to comply with your letter request * * *.

Faced with Tose's refusal to perform his obligations under the March 11 Agreement, the Wolmans filed an application with the Referee, on July 9, 1969, seeking, in the alternative, (a) an order vacating the Referee's earlier order approving the sale of the Eagles to Tose or (b) an order directing Tose to specifically perform his obligations under the March 11 Agreement.

Tose responded with a motion to dismiss the Wolmans' application, alleging, *inter alia,* that the application failed to state facts upon which relief could be granted. Specifically, he contended that:

5. There is no allegation in the Application that the debtors are ready, willing or able to purchase the assets of the Philadelphia Eagles Football Club, Inc.

6. There is no allegation in the Application that the debtors have complied with all conditions precedent to their right to purchase the assets of the Philadelphia Eagles Football Club, Inc.

After hearing oral argument on Tose's motion to dismiss, the Referee entered an order dismissing the Wolmans' application,[4] stating that it failed to state facts upon which either of the alternate forms of relief could be based.

The Wolmans appealed this order to the District Court, as provided in 11 U. S.C. § 67(c). After oral argument, the District Court affirmed the action of the Referee and this appeal followed.

## II

We hold that the Referee's dismissal was error because it was premised on the final resolution of a disputed issue of fact—the correct interpretation of the March 11 Agreement—at a procedural stage where only the sufficiency of the pleading was in issue.

Before the Referee, Tose argued that the application was defective in that it failed to allege the Wolmans had fulfilled two conditions precedent to Tose's duty to reconvey: *i. e.,* that the Wolmans had funded their plan of arrangement and that they were prepared to make him whole. Tose also argued that, as a matter of fact, it was impossible for the Wolmans to comply with the first of these conditions because the

4. On July 15, 1969, the Wolmans served notice on Tose to take certain depositions relevant to the interpretation of the March 11 Agreement. On October 9, 1969, Tose moved to stay the taking of these depositions pending determination of the then pending motion to dismiss. After a hearing, the Referee entered the requested stay order.

agreement to reconvey the Eagles referred solely to the Plan of Arrangement in existence when the March 11 Agreement was signed. As the plan then existing had since been abandoned and replaced by another plan, Tose argued that by the time the Wolmans called upon him to perform, it had become impossible for them *ever* to fund the plan contemplated by the March 11 Agreement. Therefore, Tose's argument continued, his obligation to reconvey the Eagles could never come into force.

The Wolmans, on the other hand, maintained that the pleading was not factually deficient[5] and that even if it were, a simple amendment would have cured it. In respect to the March 11 Agreement, the Wolmans took the position that

> the consideration acceptable to creditors and the method of payment thereof, [*i. e.*, the specific Plan of Arrangement] did not and could not affect Tose and was not and could not be of any concern to him. [Debtors' application before the Bankruptcy Referee ¶ 21.]

To put it more concretely, in the Wolmans' view, the March 11 Agreement referred to *any* plan of arrangement, not just the one existing on March 11. At the hearing in the District Court, the Wolmans claimed to have evidence showing that Tose was without concern as to which plan might eventually come to fruition and that he had himself so declared. His only concern, according to the Wolmans, was whether they could come up with the almost $16,000,000 necessary to buy back the Eagles.[6] Previously, the Wolmans had sought to take depositions in support of this, but the Referee, at Tose's instance, blocked the move.

Apparently the Referee accepted Tose's argument, for his order dismissing the Wolmans' application recited as its basis a failure to state facts upon which relief could be granted. Strangely enough, the order gave the Wolmans no opportunity, as is customary, to amend their petition to correct this formal deficiency. The Referee's reasons for not following the usual course become obvious from his two summary findings of fact: (1) that the March 11 Agreement referred to "the Plan of Arrangement then before this Court" and (2) "that [the Wolmans] were not about to fund *said* Plan." (Emphasis added.) Under this view, the condition precedent referred to by Tose could indeed never be performed and it would have been futile to allow an amendment.

■■ The Referee's construction of the March 11 Agreement without permitting the introduction of evidence was error. An issue of fact had arisen as to the meaning of the words "the Debtors'

---

5. We do not reach the merits of this contention; suffice it to note in passing that there is record support for the Wolmans' position in this regard. Not only is the bringing of the instant action a fair indication that the Wolmans were ready, willing and able to perform, but in paragraph 18 of the application, the Wolmans quoted from a letter their lawyer had previously sent Tose's attorney:

> The Wolmans are ready to proceed with their plan of arrangement and in this connection to recover the assets of the above club. Will you please obtain a statement from Leonard Tose, showing the amount necessary to make him whole, as contemplated by the writing of March [11], 1969.

Perhaps greater literary clarity could be desired; nevertheless, it does not require a keen imagination to read the above as an allegation that the Wolmans stand ready to perform.

Under the liberal rules of federal pleading, a complaint should survive a motion to dismiss if it sets out facts sufficient for the court to *infer* that all the required elements of the cause of action are present. 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 (1969).

6. At the hearing in the District Court, the Wolmans declared, without contradiction, that they had completed preliminary arrangements with a "New York lending institution" to borrow the money they would need to pay Tose in order to reacquire the Eagles.

Plan" in the March 11 Agreement: whether it was the intention to confine their application strictly to the then existing plan, or to any plan that might be developed in the future as well. However, no testimony was permitted to be taken and the Wolmans were never afforded an opportunity to support their interpretation. The construction of a contract is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.[7]

In affirming the Referee, the District Court stated that "The Referee's *construction* of the contract of March 11, 1969 was correct * * *" (emphasis added), making no reference to the legal propriety of a construction made at the preliminary procedural stage and with no opportunity to present evidence. The court then proceeded to make an equally impermissible construction of the March 11 agreement, again without affording the parties an opportunity to explore the pertinent context of circumstances. It held that, regardless of what plan the agreement referred to, it required *complete* funding by August 1, rather than merely sufficient funding to meet the then current payment obligations:

> Even if it should be held that the agreement of March 11 referred not to the existing plan of arrangement, but to any plan which might be proposed, it still required that the Wolmans fund the plan * * *. No money to fund the [new] plan was put up by the Wolmans before August 1, 1969 [the cut-off date in the March 11 agreement]. Only one of ten annual installments has yet been paid.

The court ventured to construe the March 11 document, once more in the face of a dispute between the parties and without taking any evidence. Moreover, the court's conclusion that by August 1 no monies had been put up to fund the new plan, appears to be in error.

The second Plan of Arrangement contemplated an initial payment by the Wolmans of $500,000 to cover "priority debts and costs and expenses of administration." *See* 11 U.S.C. § 737(2) (1964). At that time, the Wolmans were, according to the plan, to execute a promissory note in favor of the unsecured creditors, payable in ten yearly installments of $300,000. The first installment was not due until a year after the note was executed. Tose reasoned, and the court apparently agreed, that, because the note would not be paid off in its entirety for ten years, the plan would not be "funded" for ten years. Obviously, implicit in this argument is a construction of the verb "to fund." The Wolmans vigorously dispute the court's interpretation, insisting that "to fund" in the March 11 Agreement referred only to their then current obligation to meet the initial $500,000 payment and not to have current funds sufficient to pay off the entire plan. Thus, we find another issue of disputed fact resolved offhandedly without a hearing.[8]

Moreover, the court's finding that the Wolmans had not made any timely payments to fund the plan before August 1 was clearly in error. The record on appeal contains a letter, dated July 22, 1969, from attorneys representing the Columbia Financial Corp., an organization acting on behalf of the Wolmans. The letter announces:

> Pursuant to the Order signed by you [the Referee] on June 12, 1969,

---

7. Wilshire Oil Co. of Texas v. Riffe, 409 F.2d 1277, 1284 (10 Cir. 1969); Zell Ins. Agency, Inc. v. Guaranty Security Ins. Co., 399 F.2d 147, 148–149 (5 Cir. 1968); Dobson v. Masonite Corp., 359 F.2d 921, 923–924 (5 Cir. 1966).

8. Customary business practice would seem to support the Wolmans' interpretation.

Funding may be accomplished by immediate raising of a part of the amount ultimately required and arranging for the payment of future installments when due. It is not common practice, nor would it be practical in the ordinary case, to have in hand the total cash amount required for all future installments stretching over ten years.

* * * we are delivering to you herewith a cashier's check * * * in the sum of $500,000. It is understood that * * * the said $500,000 will be used to pay priority debts and costs and expenses of administration in these proceedings as provided in the plan.

Tose raised no question as to the genuineness of Columbia Finance Company's letter or the reliability of that company. Also, on July 22, the Referee entered an order acknowledging actual receipt of the $500,000. Notwithstanding the District Judge's finding to the contrary, it appears that the Wolmans had indeed met their then current obligation under the second Plan of Arrangement before August 1, 1969, the cutoff date in the March 11 Agreement.

■■ It is elementary that a motion to dismiss will be denied unless it appears to a certainty that no possible set of facts could be proved to support plaintiff's claim. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Thompson v. Brotherhood of Sleeping Car Porters, 319 F.2d 191 (4 Cir. 1963). Equally established is the rule that, on a motion to dismiss, the facts are to be taken in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Here the Wolmans offered to show facts supporting their interpretation of the March 11 Agreement.[9] They insisted that, while they had fully complied with their end of the bargain, Tose, in contrast, had anticipatorily repudiated his obligations. If the Wolmans can prove what they claim, some relief would seem appropriate. But the Referee, and later the District Court, foreclosed any examination of the merits. The Wolmans' attempt to introduce evidence was blocked and two genuine ambiguities in the March 11 Agreement were resolved against them—namely, the meaning of "the Debtors' Plan" and "to fund"—paving the way for dismissal of the action.

■ If, as the Referee found, the Wolmans' pleading was deficient in failing to allege compliance on their part, this purely formal omission could readily be supplied. Common practice is to allow such amendments liberally. Byrd v. Bates, 220 F.2d 480 (5 Cir. 1955); MacLaughlin v. Union Switch and Signal Co., 166 F.2d 46 (3 Cir. 1948). Instead, the Referee and the District Court averted their gaze from the pertinent evidence of the respective parties and concluded, with no record support, that an amendment would have been futile under *their* reading of the March 11 Agreement. Construction of the writing at this juncture was too hasty, involving, as it did, a disputed issue of fact, the resolution of which rested not in a pleading alone but in a broader purview.

Of course, we intimate no view that ultimately the Wolmans will necessarily prevail. If Tose can supply some convincing explanation for his insistence that the March 11 Agreement referred only to the then existing Plan of Arrangement or that the agreement contemplated *full* funding of the Wolmans' Plan, it is possible that the Wolmans will not be entitled to relief. But these questions cannot be disposed of intelligently in the absence of an illuminating factual inquiry. We therefore remand this case for further proceedings consistent with the foregoing opinion.

9. The Wolmans' interpretation, moreover, was not so fanciful that it could be rejected out of hand. The major purpose of the disputed agreement with Tose was to give the Wolmans more time to fulfill their Plan of Arrangement and to fend off their secured creditors who were becoming impatient with the delays encountered under the Plan. Tose, not a creditor, was involved in neither the first nor the second Plan; the Wolmans' payment to him was in no way dependent on the operation of *either* plan. In short, Tose's only real interest was whether he would be paid approximately $16,000,000 after the Wolmans put together a workable plan of arrangement. Under this view, it is entirely reasonable to conclude that Tose did not care, as he is alleged to have admitted, which Plan was funded, or how.

If it should be decided that the Wolmans are entitled to reconveyance of the Eagles, Tose may be entitled to some equitable relief. If so, it would be unconscionable for him to have no recompense for the use of his money. The Referee on remand should consider, on a *quantum meruit* basis, what sum (in addition to reimbursement contemplated by the March 11 Agreement) would make him whole and adequately compensated for the loan. In making this determination, all pertinent facts should be considered, including what profits, if any, Tose may thus far have derived from the operation of the football club.

Reversed and remanded.

WINTER, Circuit Judge (concurring specially):

Because I think that nothing will be lost, even if little is gained, by having an evidentiary hearing, I concur in the judgment of the court. Candor compels me to add, however, that, in my view, only the most positive and convincing parole evidence could justify a construction of the "March 11 Agreement" different from that placed on it by the referee and the district judge.

The majority sets forth the operative language of the agreement. It was part of a transaction in which Tose purchased the Eagles' assets; there was nothing in the overall transaction to indicate that Tose made a loan and took a pledge of those assets as security therefor. It is not an unrestricted or unconditional option to repurchase. The parties elected to predicate the right of Wolmans to repurchase upon the condition that they "are able to fund *the* Debtors Plan of Arrangement . . ." (emphasis added). There is absent any language to extend the condition to any modification of the plan or to any substitute plan. "The" plan of arrangement manifestly could mean only the

particular plan pending in the bankruptcy court at the time the parties entered into the March 11 Agreement, and that plan was subsequently abandoned so that the condition was not fulfilled.

If the language of the March 11 Agreement is not itself sufficient to require the construction of the referee and the district judge, analysis of the then pending plan should make that construction almost conclusive. Under the plan, Jerry Wolman Enterprises, Inc. (Enterprises) was incorporated and its stock was to be sold to the public. From the proceeds, Enterprises would lend $12,000,000 to the Wolmans, presumably to be used by them to pay their secured creditors. The loan was to be evidenced by a note on which the Wolmans would *not* be personally liable but the Wolmans would pledge their stock in the Eagles and their stock in Enterprises (which they received as consideration for the conveyance to Enterprises of other assets owned by them) as security for repayment of the principal and interest. Thus, for practical purposes, it is fair to say that the Enterprises loan would be repaid primarily from dividends which the Wolmans would receive on the Eagles' stock. That stock would be valueless unless the Eagles' assets were recaptured from Tose, and hence the conclusion seems inescapable that the *only* purpose of the March 11 Agreement was to permit the Wolmans to make feasible the sale of stock in Enterprises if the then pending plan of arrangement was to become an actuality. It would seem to follow that when that plan was abandoned and there was no longer a need for the Eagles to reacquire their assets from Tose in order to give value to the Wolmans' Eagles stock, the right to reacquire those assets was extinguished and what purported to be an absolute sale to Tose, subject only to limited, conditional defeasance, should be treated as a completed transaction.